**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | |
|---|---|
| BUSTER L. BROWN, | ) |
| | ) |
|     **Plaintiff,** | ) |
| | ) |
|     **vs.** | )    **Case number 4:10cv0802 TCM** |
| | ) |
| MICHAEL J. ASTRUE, | ) |
| Commissioner of Social Security, | ) |
| | ) |
|     **Defendant.** | ) |

## MEMORANDUM AND ORDER

This 42 U.S.C. § 405(g) action for judicial review of the final decision of Michael J.

Astrue, the Commissioner of Social Security (Commissioner), denying the application of

Buster L. Brown (Plaintiff) for disability insurance benefits (DIB) under Title II of the Social

Security Act (the Act), 42 U.S.C. § 401-433, is before the undersigned for a final deposition

pursuant to the written consent of the parties. See 28 U.S.C. § 636(c). Plaintiff has filed a

brief in support of his complaint; the Commissioner has filed a brief in support of his answer.

## Procedural History

Plaintiff applied for DIB in August 2006, alleging he was disabled as April 30 of that

year by open heart surgery, high blood pressure, and high cholesterol. (R.[1] at 71-75.) His

applications were denied initially and after a hearing held in June 2008 before Administrative

Law Judge (ALJ) Randolph E. Schum. (Id. at 12-19, 22-48.) The Appeals Council then

_____

[1]References to "R." are to the administrative record filed by the Commissioner with his
answer.

denied Plaintiff's request for review, effectively adopting the ALJ's decision as the final decision of the Commissioner. (Id. at 1-3.)

**Testimony Before the ALJ**

Plaintiff, represented by counsel, and Vincent F. Stock, M.A., testified at the administrative hearing.

Plaintiff was 53 years old at the time of the hearing and is a high school graduate. (Id. at 24.) He is 5 feet 10 inches tall and weighs 242 pounds. (Id. at 28.) He lives with his sister and her husband. (Id. at 32.)

From 1990 to 1994, Plaintiff worked as a shear operator. (Id. at 24-25.) In this job, the heaviest weight he lifted was 100 pounds. (Id. at 25.) From 1994 to 1995, he worked as an automobile salesman. (Id.) From 1995 to 1998, he worked as a delivery person. (Id.) The heaviest weight he lifted in this job was seventy pounds. (Id. at 26.) From 1998 to 2002, he worked delivering various types of valves and gauges and doing repair work on gauges. (Id.) In 2002 and 2003, he owned and operated a business selling and installing window blinds. (Id.) From August 2003 to March 2006, he worked as a corrections officer. (Id. at 27.) He was terminated from this job nine months after he returned to work after having heart surgery. (Id.) Initially on his return to work, he was placed on light duty, i.e., he could not lift anything heavier than ten pounds and was not to run, push, or pull. (Id. at 33.) After nine months, the City would not allow him to continue on light duty.[2] (Id.)

---

[2]The record before the ALJ included the decision of the Civil Service Commission of the City of St. Louis on Plaintiff's appeal of his dismissal from the position of Correctional Officer I, Division of Corrections. (Id. at 261-66.) Included in that decision was a finding that there were no positions

Plaintiff was diagnosed with diabetes in 1997 or 1998. (Id. at 28.) He is on glucophage and metformin. (Id.) He had been compliant until August 2006 with a diabetic diet, had fallen off the diet, and was now restarting it. (Id. at 28-29.) His doctor had observed in December 2006 that he had not been walking as he should. (Id. at 29.)

He goes deer hunting, but his brothers have to carry out and dress any deer he shoots. (Id. at 29.)

Asked if he was currently having any problems with his diabetes, Plaintiff replied that he had "a little numbness in [his] toes once in awhile." (Id.) He has not had this checked out yet. (Id.) His doctor had told him at his last visit that he had a "very fast" heart that skipped beats. (Id. at 30.) In the past several months, he has felt "very tired, irritable and short[ ] of breath." (Id.) If he walks farther than 100 yards, he becomes short of breath and tired. (Id. at 31.) He cannot do anything for any length of time. (Id. at 32.) He is not in any pain. (Id. at 31.) He has difficulties staying asleep. (Id. at 34-35.)

He takes medications for his diabetes, high blood pressure, and heart condition. (Id. at 33.) He sees his cardiologist every six months. (Id. at 34.)

Mr. Stock testified as a vocational expert (VE).

_____

that Plaintiff could perform, with or without reasonable accommodations, in the Department of Corrections with the restrictions placed by his physicians. (Id. at 263.) Plaintiff had submitted a May 2006 certificate by his physician that he was "not to be around situations that could result in trauma" and "was not able to push or pull over fifty pounds or run." (Id.) There was a position, Liquor Control Officer, that Plaintiff could perform; however, he had been interviewed and then not selected for that position. (Id. at 264.)

After he inquired of Plaintiff about the exertional demands of his past work, he was asked about a hypothetical claimant who was age 52 at Plaintiff's alleged disability onset date; had twelve years of education; had done the same past work as Plaintiff; could lift and carry up to twenty pounds occasionally and ten pounds frequently; could stand, sit, and walk for six hours out of eight; could occasionally climb stairs and ramps; should never climb ropes, ladders, or scaffolds; and should avoid concentrated exposure to fumes, odors, dust, gasses, unprotected heights, and extreme cold or heat. (Id. at 36-38.) The VE replied that the only past work Plaintiff had done as substantial gainful activity that such a hypothetical claimant could perform was the automobile salesman job. (Id. at 38.)

The ALJ modified the hypothetical by restricting the claimant to lifting ten pounds occasionally and less than ten pounds frequently, standing or walking for two hours out of eight, and sitting for six hours. (Id.) There is no past relevant work of Plaintiff's that this claimant could perform. (Id. at 38-39.) There are, however, other jobs. (Id. at 39.) A scheduler or security guard monitor are sedentary jobs, unskilled jobs that exist in significant numbers in the state and national economies. (Id.) These jobs can also be performed by someone who has shortness of breath or endurance problems that prevent him from walking farther than a few hundred yards. (Id. at 39-40.) If, however, a claimant needs an extra break in the morning and in the afternoon or needs to lay down, he is unemployable. (Id. at 40.)

### Medical and Other Records Before the ALJ

The documentary record before the ALJ included forms Plaintiff completed as part of the application process, documents generated pursuant to his application, records from health

care providers, and an assessment by a non-medical consultant of his physical residual functional capacity.

When applying for DIB, Plaintiff completed a Disability Report. (Id. at 95-103.) Open heart surgery, diabetes, high blood pressure, and high cholesterol limit his ability to work by causing him to be unable to stand for long periods of time, be unable to maintain his balance sometimes when walking, become winded when talking, and be unable to lift anything heavier than twenty-five pounds. (Id. at 96.) His impairments first bothered him on April 30, 2006, and prevented him from working that same day. (Id.) His medications include aspirin, Avandia (for diabetes), Digoxin (to slow heart rate), metformin (for diabetes), isosoride mononitrate (for high blood pressure), Lipitor (for high cholesterol), sotalol (a beta-blocker prescribed to regulate heart beats), and warfarin (an anticoagulant). (Id. at 101.)

Plaintiff also completed a Function Report. (Id. at 87-94.) Asked to describe his daily activities, he reported that he takes a shower, watches television, fixes breakfast, reads, watches television, prepares dinner, cleans dishes, watches television, reads the Bible, watches the news, and then goes to bed. (Id. at 87.) Before his impairments, he lifted heavy weights, walked long distances, hunted in hilly and secluded areas, and fished in secluded areas. (Id. at 88.) Now, he does not sleep through the night. (Id.) He needs to be reminded to take his evening medications. (Id. at 89.) He prepares his own meals, cleans dishes, sweeps, mops, and does laundry. (Id.) He drives, and goes shopping for food very two weeks. (Id. at 90.) He does not visit family and friends as often as he formerly did. (Id. at 92.) His impairments adversely affect his ability to lift, squat, bend, walk, talk, climb,

remember, concentrate, and follow instructions.  (Id. at 92.)  He can not walk farther than three blocks without having to stop and rest for five to ten minutes.  (Id.)  He follows written and spoken instructions "pretty good."  (Id.)

Plaintiff completed a Disability Report – Appeal form after the initial denial of his applications.  (Id. at 112-57.)  He had no new physical or mental limitations and no new illnesses, injuries, or conditions since completing the initial report.  (Id. at 113.)  It was taking longer for him to complete his tasks.  (Id. at 115.)

The relevant medical records before the ALJ are summarized below in chronological order and begin in December 2004 when Plaintiff saw Rene Winterberger, D.O., about his blood pressure and diabetes.[3]  (Id. at 214.)  He had not had his blood drawn – he had been too busy – or checked his blood sugar levels at home.  (Id.)  He felt good and was trying to diet.  (Id.)  He had a new girlfriend.  (Id.)  When Plaintiff returned six weeks later, in January 2005, he had still not gotten his blood work done.  (Id.)  Also, his glucometer had not been working for several weeks.  (Id.)  He felt well and was trying to get a new job.  (Id.)  His blood pressure was high that day.  (Id.)  He was to get a new glucometer and get his blood work done the next day.  (Id.)  Dr. Winterberger noted three days later that Plaintiff was to increase his Glucovance (for treatment of Type 2 diabetes) to twice in the morning and twice in the afternoon.  (Id.)

_____

[3]Dr. Winterberger refers to this visit as being a "follow-up"; however, there are no earlier records.

In February, Plaintiff told Dr. Winterberger that he had not been taking his blood pressure or his blood sugar medicine on a regular basis and had not increased the Glucovance as directed. (Id.) He did not have any problems with his feet. (Id.) He was admonished to take his medication as directed, advised that losing weight would help with his blood sugar and blood pressure problems, and told to increase his dosage of Lisinopril. (Id.)

In March, Plaintiff admitted to Dr. Winterberger that he had not taken his medications that morning. (Id. at 213.) He was not compliant with his medications or his diet. (Id.) He knew that he was making poor choices. (Id.)

On April 1, he called Dr. Winterberger to report that his chest had begun hurting when he walked his dog and had stopped hurting when he rested. (Id.) He was advised to go the emergency room. (Id.)

He did, and was admitted to St. Anthony's Medical Center (St. Anthony's) for observation. (Id. at 158-65, 215.) He reported that he had been having intermittent chest discomfort, primarily on exertion, that occasionally radiated to the right shoulder or both shoulders. (Id. at 161.) The pain improved when he was resting. (Id.) He did not have any associated shortness of breath, palpitation, diaphoresis (perspiration), lightheadedness, vomiting, nausea, fever, or chills. (Id.) On examination, he was in no acute distress and was alert and oriented times three. (Id.) A chest x-ray revealed a borderline heart size, pulmonary vascular redistribution, bibasilar infiltrate, old granulomatous disease, and degenerative spurring about the right acromioclavicular joint. (Id. at 165.) A myocardial infarction was ruled out. (Id. at 162.) His medical history was remarkable for diabetes and

hypertension. (Id.) Plaintiff was to be scheduled for an outpatient exercise thallium stress test. (Id.) A consulting cardiologist, Charles Carey, M.D., discussed with Plaintiff the possibility that he would have to have a cardiac catheterization. (Id. at 164.) Plaintiff was discharged the next day.

Two days later, Plaintiff had a dual isotope stress test. (Id. at 183-85.) The test was negative for inducible myocardial ischemia. (Id. at 185.) He had a normal blood pressure response to the exercise and had an average exercise tolerance without any symptoms of chest discomfort. (Id.)

On April 7, Plaintiff was admitted to St. Anthony's and underwent quadruple coronary artery bypass surgery performed by Steven Eisenberg, M.D. (Id. at 146-57, 179, 181-82.) He was discharged home on his fourth postoperative day. (Id. at 148.)

He reported to Dr. Winterberger later that month that his pain was decreasing. (Id. at 212.) He had not had any chest pain or shortness of breath. (Id.) He was trying to be more vigilant about checking his blood sugar levels. (Id.) He was to continue with his current medications and check his blood sugar at least one time a day and preferably four times. (Id.) He was cautioned that his heart problem could reoccur if he did not take care of his health. (Id.) His weight was 253 pounds, 4 pounds less than at the previous visit. (Id.) He was to return in six weeks. (Id.)

Plaintiff was consistently described as doing well when seeing Dr. Eisenberg for office visits on April 20, May 18, and June 15. (Id. at 130-33.)

After his May visit to Dr. Eisenberg, he returned to Dr. Winterberger.  (Id. at 211.)
He had not been compliant with his diet.  (Id.)  He had not brought in his blood sugar reading
records.  (Id.)  He was told that he was going to have a heart attack or need more heart
surgery if he did not start taking better care of his health.  (Id.)  He had not been taking
Glucovance as instructed back in January and was again told to take two tablets twice a day.
(Id.)  Plaintiff stated he would make an appointment to see a dietician at St. Anthony's the
beginning of June.  (Id.)  He was to return in one month.  (Id.)

When Plaintiff began cardiac rehabilitation in May, it was noted that he was in atrial
fibrillation.  (Id. at 142-45, 177-78.)  An electrocardiogram (ECG) in June revealed a normal
left ventricular systolic function and a left ventricular ejection fraction in the range of 55 to
65%.  (Id. at 143, 190-91.)  There was also mild mitral valvular regurgitation, a mildly dilated
left atrium, and a mildly reduced left atrial appendage function.  (Id.)  A cardioversion[4]
brought Plaintiff's sinus rhythms back to normal.  (Id. at 145, 192.)

Two weeks later, Plaintiff saw Dr. Winterberger.  (Id. at 211.)  Again, he did not have
his blood sugar records.  (Id.)  His weight was 263 pounds, the same as in May.  (Id.)  Dr.
Winterberger told Plaintiff that he should see a diabetes specialist and be on insulin therapy.
(Id.)  Plaintiff declined, and requested that he be given "another month to try and straighten
himself out."  (Id.)  He was reminded that if he did not, he would have another heart attack.
(Id.)

_____

[4]A cardioversion is the "[r]estoration of the heart's rhythm to normal by electrical
countershock."  Stedman's Medical Dictionary, 283 (26th ed. 1995).

Plaintiff reported to Dr. Eisenberg in July that he was back at work and it was going well.  (<u>Id.</u> at 129.)  He was walking three times a week without becoming short of breath.  (<u>Id.</u>)  He made a similar report to Dr. Carey.  (<u>Id.</u> at 174.)

One week later, he underwent another successful cardioversion after going back into atrial fibrillation.  (<u>Id.</u> at 141-42, 173.)

Dr. Eisenberg described Plaintiff in August as healing well.  (<u>Id.</u> at 128.)  Dr. Carey reported the same month that Plaintiff was doing well, although he still felt that he was in sinus rhythm.  (<u>Id.</u> at 172.)  He was exercising thirty minutes at a time and trying to do so three times a week.  (<u>Id.</u>)  He was having trouble with his work.  (<u>Id.</u>)  Dr. Winterberger reported at Plaintiff's August visit that he had returned to work and was working at the front desk.  (<u>Id.</u> at 210.)  The job was tiring, and he was depressed.  (<u>Id.</u>)  He was thinking about starting a home exercise program, and was encouraged to do so.  (<u>Id.</u>)  He had lost one pound.  (<u>Id.</u>)  He had brought his blood sugar record book with him.  (<u>Id.</u>)  He declined to take any medication for his depression.  (<u>Id.</u>)

The following month, Plaintiff informed Dr. Winterberger that he was feeling better emotionally and was motivated to take care of his health.  (<u>Id.</u>)  His blood sugar levels were lower than in the previous month and his weight had decreased four pounds.  (<u>Id.</u>)  He was given a telephone number for a dietician.  (<u>Id.</u>)

When Plaintiff saw Dr. Winterberger in October, he complained of right knee pain.  (<u>Id.</u> at 209.)  He had been climbing ladders.  (<u>Id.</u>)  He had not contacted a dietician, was not

following a diabetic diet, and was not exercising.  (<u>Id.</u>)  His weight was again 263 pounds.  (<u>Id.</u>)  Again, he was reminded he had to control his diet.  (<u>Id.</u>)

After Plaintiff's October visit, Dr. Eisenberg noted that he was to return only as needed.  (<u>Id.</u> at 127.)  Plaintiff did see Dr. Carey in November, reporting that he was walking four blocks a day without chest pain or shortness of breath.  (<u>Id.</u> at 171.)

In December, Plaintiff forgot to bring his blood sugar record book to his visit to Dr. Winterberger.  (<u>Id.</u> at 209.)  He denied having any chest pain or shortness of breath.  (<u>Id.</u>)  He wanted to begin weightlifting.  (<u>Id.</u>)  He had not spoken with a dietician, but had gained four pounds.  (<u>Id.</u>)  His dosages of Lisinopril and Lipitor were increased.  (<u>Id.</u>)  He said he would contact a dietician.  (<u>Id.</u>)

When Plaintiff saw Dr. Carey in April 2006 he reported having felt a brief, one to two second, thud or thump in his chest two days earlier when walking.  (<u>Id.</u> at 170.)  He had felt lightheaded since and had some slight black spots in both eyes.  (<u>Id.</u>)  His heart beat was irregular and he was more short of breath than usual.  (<u>Id.</u>)  Dr. Carey discussed a cardioversion with Plaintiff and also discussed his concern with Plaintiff's job, noting that Plaintiff had said he did not infrequently get attacked by inmates.  (<u>Id.</u>)

Plaintiff reported to Dr. Winterberger in May that he had been"forced out of working at the prison at the end of March."  (<u>Id.</u> at 207.)  The assessment was Type 2 diabetes (diabetes mellitus), coronary artery disease, and atrial fibrillation.  (<u>Id.</u>)  He had been out of Glucovance for two or three days.  (<u>Id.</u>)  His weight was 251 pounds.  (<u>Id.</u>)

Plaintiff was admitted June 11 to St. Anthony's Medical Center for observation after he had a recurrence of atrial fibrillation.  (Id. at 135-39, 194-95, 168-69.)  He reported that he would become short of breath after walking only fifty feet.  (Id. at 135.)  He had no chest pain, no nocturnal shortness of breath, and no dizziness.  (Id.)  On examination, he was in no acute distress.  (Id. at 136.)  His heart beat was irregular.  (Id.)  When first read, his blood pressure was elevated.  (Id. at 137.)  An ECG again revealed a normal left ventricular systolic function and a left ventricular ejection fraction in the range of 55 to 65%.  (Id. at 186-87.)  There was also trivial aortic valvular regurgitation, mild to moderate mitral valvular regurgitation, moderate atheroma of the descending aorta, and a mildly to moderately dilated left atrium.  (Id. at 186.)  The following day, Plaintiff had a successful cardioversion.  (Id. at 139, 180.)

On July 17, Plaintiff reported to Dr. Carey that he was feeling good and had no chest discomfort, further explaining that he could walk six to eight blocks up and down hills without having to stop.  (Id. at 167.)

Plaintiff informed Dr. Winterberger at his August visit that he was going to start following a diabetic diet.  (Id. at 206, 220.)  His weight was 261 pounds.  (Id.)  His medications were renewed.  (Id.)

Plaintiff consulted Dr. Eisenberg in November about disability.  (Id. at 228.)  He complained of tachypnea (rapid breathing) and heavy breathing with conversation.  (Id.)  His breathing was unlabored when he was at rest.  (Id.)  Dr. Eisenberg did not place any restrictions on Plaintiff.  (Id.)

The following month, Plaintiff had another ECG, which showed a normal sinus rhythm, normal cardiac output, and a poor R-wave progression. (Id. at 230, 232.) Dr. Carey thought the latter could be related to his body habitus, but could not rule out a septal myocardial infarction. (Id.) Plaintiff reported that he was doing well overall. (Id. at 230.) Two previous episodes of feeling short of breath had resolved without any interference. (Id.) He had not been following any regular walking program. (Id.) He would walk about 150 yards when deer hunting, but someone would always help him carry the carcase out. (Id.) He was encouraged to follow a regular walking program and told to take sotalol twice a day, not once a day. (Id. at 231.) He was to return in six months or sooner if need be. (Id.)

The same day he saw Dr. Carey, Plaintiff saw Dr. Winterberger to request that his medications be adjusted so that he could get them from Wal-Mart. (Id. at 251.) He complained of episodes of heavy breathing lasting less than eight hours. (Id.) He was again told to lose weight and exercise. (Id.) His weight was 267 pounds. (Id.)

Plaintiff reported to Dr. Winterberger in April 2007 that he was not keeping track of his blood sugar levels, was not taking his Avandia because it cost too much, and was trying to eat better. (Id. at 250.) He was not having any chest pain, headaches, or dizziness, but had been coughing a lot for the past two weeks. (Id.) He was informed that his blood sugar levels on a test three months earlier established that he would need to be on insulin. (Id.) He agreed. (Id.) He was not to start taking insulin until he had spoken with the St. Anthony's diabetes counselors and he was to have a chest x-ray. (Id.) One month later, he had not yet done so. (Id. at 249.) He had also not checked his blood sugar levels or had a chest x-ray.

(Id.)  He had, however, hurt his left ankle when riding his motorcycle the previous week.

(Id.)  He was started on antibiotics.  (Id.)  Three weeks later, on May 21, his left ankle was healing and was not infected.  (Id. at 248.)  He was to see the diabetes counselor the same day and begin taking insulin.  (Id.)

Plaintiff reported to Dr. Winterberger at his June visit that he had begun taking insulin.  (Id. at 247.)  He was to increase the amount of insulin he took in the morning from ten to fourteen units and in the evening from five to nine units.  (Id.)  Dr. Winterberger completed an exemption request for Plaintiff to use a cross-bow during hunting season.  (Id.)  At his next visit the next month, Dr. Winterberger again admonished Plaintiff to track his blood sugar levels and to be compliant with his diet and medication.  (Id. at 246.)

Plaintiff told Dr. Carey in December that he was doing well "overall."  (Id. at 257.)  He did not have any chest pain, shortness of breath, palpitations, bleeding, or loss of consciousness.  (Id.)  He was depressed about financial issues.  (Id.)  He was not having any angina or heart failure symptoms.  (Id.)  He was not doing a regular exercise program, and was told he needed to.  (Id.)  He was also cautioned about the "narrow therapeutic window" for Coumadin and the resulting need to get an International Normalized Ratio (INR) done.  (Id.)  Dr. Carey noted that Plaintiff's lack of insurance was affecting his medical care.  (Id.)

Also before the ALJ was a Physical Residual Functional Capacity Assessment (PRFCA) of Plaintiff completed by an agency nonmedical consultant.  (Id. at 221-26.)  The primary diagnosis was coronary artery disease; the secondary diagnosis was diabetes mellitus; other alleged impairments included atrial fibrillation and moderate obesity.  (Id. at

221.)  These impairments resulted in exertional limitations of Plaintiff being able to occasionally lift or carry twenty pounds; frequently lift or carry ten pounds; and stand, walk, or sit about six hours in an eight-hour day.  (Id. at 222.)  Because of his shortness of breath and "general heart condition," Plaintiff had postural limitations of avoiding more than occasional climbing, balancing, kneeling, crouching, and crawling.  (Id. at 223-24.)  He had no manipulative, visual, communicative, or environmental limitations.  (Id. at 224-25.)

### The ALJ's Decision

Analyzing Plaintiff's application pursuant to the Commissioner's sequential evaluation process, the ALJ found that Plaintiff met the insured status requirements of the Act on April 30, 2006, and had not engaged in substantial gainful activity since that date.  (Id. at 16-17.)

The ALJ next found that Plaintiff had severe impairments of coronary artery disease and a history of atrial fibrillation.  (Id. at 17.)  His diabetes mellitus, high blood pressure, and high cholesterol were not severe and were not accompanied by any work-related limitations. (Id.)  His allegation of sleep difficulty was dismissed for lack of a medically determinable impairment.  (Id.)  Plaintiff has not and did not have an impairment or combination thereof that met or medically equaled an impairment of listing-level severity.  (Id.)  Specifically, the listing for recurrent arrhythimas, Listing 4.05, was not met because there were no uncontrolled, repeated episodes of cardiac syncope (loss of consciousness) or near syncope and arrhythmia despite prescribed treatment.  (Id. at 18.)

Addressing the question of Plaintiff's residual functional capacity (RFC), the ALJ found that his impairments precluded him from lifting and carrying more than ten pounds

frequently and twenty pounds occasionally; sitting more than six hours in an eight-hour day; standing and/or walking for a total of six hours in an eight-hour day; more than occasionally climbing stairs or ramps; never climbing ladders, ropes, or scaffolds; and avoiding concentrated exposure to hazardous heights, fumes, odors, dust, gases, and extreme cold and heat. (Id.)

In reaching his conclusions about Plaintiff's RFC, the ALJ reviewed Plaintiff's testimony and the other evidence of record. (Id. at 18-19.) He found that Plaintiff had complications, but not disabling ones. (Id. at 18.) For instance, after June 2006 he remained asymptomatic. (Id.) His testimony that he had difficulty walking farther than 100 yards was inconsistent with his hunting and grocery shopping. (Id.) His testimony about atrial fibrillation was inconsistent with his cardiologist's records and his reports to the cardiologist of doing well. (Id. at 18-19.) And, a treating source had opined a month before Plaintiff's June 2006 procedure that Plaintiff should refrain only from pushing or pulling more than fifty pounds and from running.[5] (Id. at 18.) Moreover, Plaintiff "essentially admitted to St. Louis' Civil Service Commission in May 2006 that he was capable of performing work at the light exertional level." (Id. at 19.)

With his RFC, the ALJ concluded that Plaintiff could perform his past relevant work as an automobile salesman as it was customarily performed in the national economy. (Id. at 19.) He was not, therefore, disabled within the meaning of the Act. (Id.)

**Additional Records before the Appeals Council**

_____

[5]See note 2, supra.

After the ALJ rendered his adverse decision, Plaintiff's attorney submitted additional records to the Appeals Council.

These records included notes of a June 2008 office visit to Dr. Winterberger. (Id. at 268.) Plaintiff reported that he had not been taking his medications for a few months and had not been checking his blood sugar because of financial constraints. (Id.) He also declined a ECG because of the cost. (Id.) He had learned of a new "three-month supply for $10" prescription program at Wal-Mart and wanted his medications refilled. (Id.) They were, and he was given samples of Lipitor. (Id.) He was to see Dr. Carey and was to have his disability hearing the next week. (Id.)

Plaintiff had an ECG the next month. (Id. at 272.) It revealed atrial fibrillation and nonspecific T-wave abnormalities. (Id.) He told Dr. Carey that he had had a decline in his ability to walk any distance and was now getting short of breath after walking for only a block or so. (Id. at 271.) Dr. Carey noted that this decline was around the same time as Plaintiff stopped taking his medications. (Id.)

## Legal Standards

Under the Act, the Commissioner shall find a person disabled if the claimant is "unable to engage in any substantial activity by reason of any medically determinable physical or mental impairment," which must last for a continuous period of at least twelve months or be expected to result in death. 42 U.S.C. § 1382c(a)(3)(A). The impairment suffered must be "of such severity that [the claimant] is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other

kind of substantial gainful work which exists in the national economy."  42 U.S.C. §

1382c(a)(3)(B).

The Commissioner has established a five-step process for determining whether a

person is disabled.  See 20 C.F.R. § 404.1520; **Hurd v. Astrue**, 621 F.3d 734, 738 (8th Cir.

2010); **Gragg v. Astrue**, 615 F.3d 932, 937 (8th Cir. 2010); **Moore v. Astrue**, 572 F.3d 520,

523 (8th Cir. 2009).  "Each step in the disability determination entails a separate analysis and

legal standard." **Lacroix v. Barnhart**, 465 F.3d 881, 888 (8th Cir. 2006).  First, the claimant

cannot be presently engaged in "substantial gainful activity."  See 20 C.F.R. § 404.1520(b);

**Hurd**, 621 F.3d at 738.  Second, the claimant must have a severe impairment.  See 20 C.F.R.

§ 404.1520(c).  The Act defines "severe impairment" as "any impairment or combination of

impairments which significantly limits [claimant's] physical or mental ability to do basic

work activities . . . ." Id.

At the third step in the sequential evaluation process, the ALJ must determine whether

the claimant has a severe impairment which meets or equals one of the impairments listed in

the regulations and whether such impairment meets the twelve-month durational requirement.

See 20 C.F.R. § 404.1520(d) and Part 404, Subpart P, Appendix 1.  If the claimant meets

these requirements, he is presumed to be disabled and is entitled to benefits.  **Warren v.**

**Shalala**, 29 F.3d 1287, 1290 (8th Cir. 1994).

"Prior to step four, the ALJ must assess the claimant's [RFC], which is the most a

claimant can do despite [his] limitations."  **Moore**, 572 F.3d at 523 (citing 20 C.F.R.

§ 404.1545(a)(1)).  "[RFC] is not the ability merely to lift weights occasionally in a doctor's

office; it is the ability to perform the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world." **Ingram v. Chater**, 107 F.3d 598, 604 (8th Cir. 1997) (internal quotations omitted). Moreover, "'a claimant's RFC [is] based on all relevant evidence, including the medical records, observations by treating physicians and others, and an individual's own description of his limitations.'" **Moore**, 572 F.3d at 523 (quoting <u>Lacroix</u>, 465 F.3d at 887); <u>accord</u> **Partee v. Astrue**, 638 F.3d 860, 865 (8th Cir. 2011). "The need for medical evidence, however, does not require the [Commissioner] to produce additional evidence not already within the record. '[A]n ALJ is permitted to issue a decision without obtaining additional medical evidence so long as other evidence in the record provides a sufficient basis for the ALJ's decision.'" **Howard v. Massanari**, 255 F.3d 577, 581 (8th Cir. 2001) (quoting <u>Anderson v. Shalala</u>, 51 F.3d 777, 779 (8th Cir. 1995)) (second alteration in original).

In determining a claimant's RFC, "'the ALJ must first evaluate the claimant's credibility.'" **Wagner v. Astrue**, 499 F.3d 842, 851 (8th Cir. 2007) (quoting <u>Pearsall v. Massanari</u>, 274 F.3d 1211, 1217 (8th Cir. 2002)). This requires that the ALJ consider "'(1) the claimant's daily activities; (2) the duration, frequency, and intensity of the pain; (3) the precipitating and aggravating factors; (4) the dosage, effectiveness, and side effects of medication; (5) any functional restrictions; (6) the claimant's work history; and (7) the absence of objective medical evidence to support the claimant's complaints.'" **Buckner v. Astrue**, 646 F.3d 549, 558 (8th Cir. 2011) (quoting <u>Moore</u>, 572 F.3d at 524). After considering these factors, the ALJ must make express credibility determinations and set forth

the inconsistencies in the record which caused the ALJ to reject the claimant's complaints. **Singh v. Apfel**, 222 F.3d 448, 452 (8th Cir. 2000); **Beckley v. Apfel**, 152 F.3d 1056, 1059 (8th Cir. 1998).

At step four, the ALJ determines whether claimant can return to his past relevant work, "review[ing] [the claimant's] [RFC] and the physical and mental demands of the work [claimant has] done in the past." 20 C.F.R. § 404.1520(e). Additionally, "[a]n ALJ may find the claimant able to perform past relevant work if the claimant retains the ability to perform the functional requirements of the job as [ ]he actually performed it or as generally required by employers in the national economy." **Samons v. Astrue**, 497 F.3d 813, 821 (8th Cir. 2007). The burden at step four remains with the claimant to prove his RFC and establish that he cannot return to his past relevant work. **Moore**, 572 F.3d at 523; accord **Dukes v. Barnhart**, 436 F.3d 923, 928 (8th Cir. 2006); **Vandenboom v. Barnhart**, 421 F.3d 745, 750 (8th Cir. 2005).

If the ALJ holds at step four of the process that a claimant cannot return to past relevant work, the burden shifts at step five to the Commissioner to establish that the claimant maintains the RFC to perform a significant number of jobs within the national economy. **Pate-Fires v. Astrue**, 564 F.3d 935, 942 (8th Cir. 2009); **Banks v. Massanari**, 258 F.3d 820, 824 (8th Cir. 2001). See also 20 C.F.R. § 404.1520(f). The Commissioner may meet his burden by eliciting testimony by a VE, **Pearsall**, 274 F.3d at 1219, based on hypothetical questions that "'set forth impairments supported by substantial evidence on the record and accepted as true and capture the concrete consequences of those impairments,'" **Jones v.**

**Astrue**, 619 F.3d 963, 972 (8th Cir. 2010) (quoting Hiller v. S.S.A., 486 F.3d 359, 365 (8th Cir. 2007)).

If the claimant is prevented by his impairment from doing any other work, the ALJ will find the claimant to be disabled.

The ALJ's decision whether a person is disabled under the standards set forth above is conclusive upon this Court "'if it is supported by substantial evidence on the record as a whole.'" **Wiese v. Astrue**, 552 F.3d 728, 730 (8th Cir. 2009) (quoting Finch v. Astrue, 547 F.3d 933, 935 (8th Cir. 2008)); accord **Dunahoo v. Apfel**, 241 F.3d 1033, 1037 (8th Cir. 2001). "'Substantial evidence is relevant evidence that a reasonable mind would accept as adequate to support the Commissioner's conclusion.'" **Partee**, 638 F.3d at 863 (quoting Goff v. Barnhart, 421 F.3d 785, 789 (8th Cir. 2005)). When reviewing the record to determine whether the Commissioner's decision is supported by substantial evidence, however, the Court must consider evidence that supports the decision and evidence that fairly detracts from that decision. **Moore v. Astrue**, 623 F.3d 599, 602 (8th Cir. 2010); **Jones**, 619 F.3d at 968; **Finch**, 547 F.3d at 935. The Court may not reverse that decision merely because substantial evidence would also support an opposite conclusion, **Dunahoo**, 241 F.3d at 1037, or it might have "come to a different conclusion," **Wiese**, 552 F.3d at 730. "'If, [however,] after reviewing the record, the court finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the court must affirm the ALJ's decision." **Partee**, 638 F.3d at 863 (quoting Goff, 421 F.3d at 789). See also **Owen v. Astrue**, 551 F.3d 792, 798 (8th Cir. 2008) (the ALJ's denial of benefits is not to be

reversed "so long as the ALJ's decision falls within the available zone of choice") (internal quotations omitted).

**<u>Discussion</u>**

Plaintiff argues that (1) the ALJ erred in finding he could return to his past relevant work as an automobile salesman; (2) the ALJ improperly assessed his credibility; and (3) the Appeals Council erred by failing to consider new and material evidence when assessing his credibility and determining whether he is disabled. The Commissioner disagrees.

Plaintiff first argues that the ALJ erred by failing to pose a complete hypothetical question to the VE and by not making a function-by-function analysis of the exertional and nonexertional demands of his past work as an automobile salesman. This argument misapprehends the record.

The VE testified that a claimant who could lift and carry up to twenty pounds occasionally and ten pounds frequently; who could stand, sit, and walk for six hours out of eight; who could occasionally climb stairs and ramps but never climb ropes, ladders, or scaffolds; and who should avoid concentrated exposure to fumes, odors, dust, gases, unprotected heights, and extreme cold or heat could perform Plaintiff's past relevant work as an automobile salesman. The limitations of this hypothetical claimant are the limitations found by the ALJ to be Plaintiff's. "A vocational expert's testimony 'based on a properly phrased hypothetical question constitutes substantial evidence.'" **Haggard v. Apfel**, 175 F.3d 591, 595 (8th Cir. 1999) (quoting <u>Roe v. Chater</u>, 92 F.3d 672, 675 (8th Cir. 1996)); <u>accord</u> **Guilliams v. Barnhart**, 393 F.3d 798, 804 (8th Cir. 2005). And, as noted above, "[a]

hypothetical question 'is sufficient if it sets forth the impairments which are accepted as true by the ALJ.'" **Haggard**, 175 F.3d at 595 (quoting <u>Davis v. Shalala</u>, 31 F.3d 753, 755 (8th Cir. 1994)).

Additionally, the limitations in the hypothetical question posed to the VE are the same as in the <u>Dictionary of Occupational Titles</u> (DOT). Specifically, the DOT's criteria for the job of automobile salesman, 273.353-10, include exertional demands consistent with Plaintiff's RFC and no climbing, no exposure to extreme cold or heat, and no exposure to unprotected heights, atmospheric conditions, or "other environmental conditions." <u>See</u> <u>DOT</u>, 273.353-10, 1991 WL 672465 (4th ed. 1991). Thus, the VE's testimony is consistent with the DOT's definition.

Citing Social Security Ruling 96-8p, Plaintiff contends that ALJ failed in his duty to make a function-by-function analysis of his job as an automobile salesman. The concern of Ruling 96-8p is "that a failure to make the function-by-function assessment 'could result in the adjudicator overlooking some of an individual's limitations or restrictions'" **Depover v. Barnhart**, 349 F.3d 563, 567 (8th Cir. 2003) (quoting 96-8p). In the instant case, the ALJ did not.

Plaintiff further argues that the ALJ improperly analyzed his credibility by (a) not properly evaluating his credibility, (b) by finding that he had admitted to the Civil Service Commission that he could perform light work, and (c) finding that his statements about the continuation of atrial fibrillation was inconsistent with the medical records.

Plaintiff correctly notes that a claimant "'need not be bedridden in order to be unable to work' . . . ." **Wagner**, 499 F.3d at 851 (quoting Roberson v. Astrue, 481 F.3d 1020, 1025 (8th Cir. 2007)). Cf. **Medhaug v. Astrue**, 578 .3d 805, 817 (8th Cir. 2009) ("[A]cts such as cooking, vacuuming, washing dishes, doing laundry, shopping, driving, and walking, are inconsistent with subject complaints of disabling pain."). The ALJ did not require him to be. Rather, he noted the inconsistency between Plaintiff's testimony that he could walk no farther than 100 yards and his activities of hunting and grocery shopping *and* his statements that he could walk 150 yards and up and down hills without resting. See **Buckner**, 646 F.3d at 558 (holding that an ALJ may discredit complaints of disabling pain "if there are inconsistencies in the evidence as a whole") (internal quotations omitted); **Partee**, 638 F.3d at 865 (holding to same effect); **Van Vickle v. Astrue**, 539 F.3d 825, 828 (8th Cir. 2008) (same). See also **Choate v. Barnhart**, 457 F.3d 865, 871 (8th Cir. 2006) (finding ALJ's adverse credibility determination was supported by record, including the inconsistencies between claimant's "self-reported limitations on his daily activities" and the medical record).

Other considerations further detracted from Plaintiff's credibility. "A failure to follow a recommended course of treatment . . . weighs against a claimant's credibility." **Guilliams**, 393 F.3d at 802. See **Wildman v. Astrue**, 596 F.3d 959, 969 (8th Cir. 2010) (claimant's noncompliance with her doctor's instructions to take her medications, follow her diet, and totally abstain from drugs and alcohol was a valid consideration supporting adverse credibility determination); **Mouser v. Astrue**, 545 F.3d 634, 638 (8th Cir. 2008) (failure of claimant with shortness of breath problems to stop smoking is a failure to follow a prescribed course

of treatment and was properly considered when assessing his credibility); **Lewis v. Barnhart**, 353 F.3d 642, 647 (8th Cir. 2003) (ALJ properly considered failure of claimant alleging disability due to asthma and joint pain to stop smoking cigarettes daily and to start exercising as her doctors recommended). Plaintiff consistently failed to diet and exercise, as instructed, and to take his medication as prescribed. Conditions that are controlled by medication cannot be considered disabling. **Brown v. Astrue**, 611 F.3d 941, 955 (8th Cir. 2010).

Plaintiff contends that any failure to comply with a course of treatment is attributable to his lack of funds and insurance. These lacks may be "justifiable cause" for a failure to follow prescribed or recommended treatment or to pursue such treatment to remedy a disabling impairment. See **Brown v. Barnhart**, 390 F.3d 535, 540 (8th Cir. 2004); accord **Clark v. Shalala**, 28 F.3d 828, 831 n.4 (8th Cir. 1994). In order to be such cause, however, there must be evidence that the claimant was denied medical treatment due to financial reasons. **Goff**, 421 F.3d at 793; accord **Murphy v. Sullivan**, 953 F.2d 383, 386-87 (8th Cir. 1992) (rejecting claim of financial hardship in case in which there was no evidence that claimant had attempted to obtain low cost medical treatment or had been denied care because of inability to pay). Such evidence is lacking in the instant case.[6]

Also detracting from Plaintiff's credibility is the lack of any functional restrictions placed on him by physicians that are more restrictive than those included in the ALJ's RFC findings. See **Moore**, 572 F.3d at 525 (holding that "[a] lack of functional restrictions is

---

[6]Also, the Court notes that Plaintiff failed to comply with his doctors' instructions to diet and exercise and to take his prescribed medication when he was employed.

inconsistent with a disability claim" and affirming adverse credibility determination when claimant's testimony that she could not use her hands and was limited to sitting no longer than ten to fifteen minutes were limitations not imposed by any physician); **Samons**, 497 F.3d at 820-21 (affirming adverse credibility determination supported, in part, by absence of any functional limitations although claimant described disabling back pain).

Plaintiff also contends that the ALJ erred by stating that he had admitted to the Civil Service Commission that he could perform work at the light exertional level. This also misapprehends the record. The ALJ stated that Plaintiff "*essentially* admitted" such. (R. at 18 (emphasis added).) He did. He submitted a physician's May 2006 certificate that he could perform work that did not expose him to "situations that could result in trauma" and did not require him to "push or pull over fifty pounds or run." (Id. at 236.) "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." 20 C.F.R. § 404.1567(b). Additionally, Plaintiff thereafter applied for a position with the City of St Louis that conformed to his physician's restrictions.

There is substantial evidence on the record as a whole to support the ALJ's finding that Plaintiff's complaints of continuing atrial fibrillation were inconsistent with the medical records. As noted by the Commissioner, those records include notes that the atrial fibrillation improved with medication, when Plaintiff took it, and exam findings of normal sinus rhythms and normal cardiac exams.

As noted above, records of a June 2008 office visit to Dr. Winterberger and a July 2008 exam by Dr. Carey were before the Appeals Council. Because this evidence was

presented to the Appeals Council and arguably related to the period before the ALJ's decision, it becomes part of the administrative record. See **Gragg**, 615 F.3d at 939 n.2 (citing Cunningham v. Apfel, 222 F.3d 496, 500 (8th Cir. 2000)). The evidence does not, however, favor a reverse and remand. Both records link the adverse findings to Plaintiff's failure to take his prescribed medication. This, as also noted above, militates against a finding of disability.

### Conclusion

Considering all the evidence in the record, including that which detracts from the ALJ's conclusions, the Court finds that there is substantial evidence to support the ALJ's decision. "As long as substantial evidence in the record supports the Commissioner's decision, [this Court] may not reverse it [if] substantial evidence exists in the record that would have supported a contrary outcome or [if this Court] would have decided the case differently." **Krogmeier v. Barnhart**, 294 F.3d 1019, 1022 (8th Cir. 2002) (internal quotations omitted). Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is AFFIRMED and that this case is DISMISSED.

An appropriate Judgment shall accompany this Memorandum and Order.


/s/ Thomas C. Mummert, III
THOMAS C. MUMMERT, III
UNITED STATES MAGISTRATE JUDGE

Dated this  8th  day of September, 2011.